Good morning everyone. We have four cases on this morning's oral argument calendar and we'll begin in Appeal No. 232330, LKQ Corporation v. Robert Rutledge. Mr. Rice, good morning. Yes, good morning, Your Honors. Joel Rice on behalf of the appellant, LKQ. Your Honors, the District Court's grant of summary judgment in favor of Mr. Rutledge and denial of LKQ's summary judgment motion as to the count one stock grant agreements was reversible error. Also, the District Court's grant of summary judgment in Rutledge's favor as to the count two non-competition agreements was likewise error and as to that count, it should be remanded for further proceedings including a potential trial. Turning first to count one, the forfeiture provisions. Fundamentally, the District Court committed a conceptual error in how it analyzed the stock of the forfeiture for competition provisions in those stock grant agreements. Mr. Rice, in the 2020 version of that agreement on or in section 17 subpart B, it says that in addition the company shall be entitled to injunctive relief for any violation by the key person of this section 17. That doesn't sound like a forfeiture agreement to me. That sounds like a typical restrictive covenant agreement. I don't recall either or in any of in Ainslie or in any other cases upon which you rely that there was a grant of injunctive relief in the agreement that the courts were considering. What impact does that have on your argument? Your Honor, I know this. LKQ was never seeking injunctive relief. Regardless, under the agreement, the agreement gives LKQ the right to do so. Is that correct? I was not aware that injunctive relief was in play in the stock grant agreements. It certainly wasn't briefed. It was not something that the parties considered below. I guess my question is this is motion for summary judgment, so we're looking at the record de novo. Conceptually, it seems like the argument that you're making is that the restrictive stock unit agreements are different from the restrictive covenant agreements because the restrictive stock unit agreements only have a clawback or forfeiture provision, whereas the restrictive covenant agreements, that's where you have all the injunctive relief. But say, for example, the restrictive covenant agreements also had, let's say, a liquidated damage provision or a clawback provision as a restrictive stock unit agreement, then there would be no difference between the two, right? And so it seems to me that the fact that the restrictive stock unit agreements does provide the company with the option to get injunctive relief for any violations of the restrictive covenants that are set forth therein seems to me to make quite a bit of difference in this case. Again, Your Honor, this was not what LKQ was seeking under count one. It didn't seek to always be predicated on count two, the non-competition agreement. And no, Your Honor, I don't see it as distinguishable because there's been all LKQ has ever asked for is the return of the substantial benefits that they provided to Mr. Rutledge for the simple promise not to compete for a limited period of nine months. Mr. Rice, I'm sorry, one follow-up. Judge Cutter, so are you conceding for the purpose of this case that that last sentence has no effect, that is, that the restrictive stock unit agreements that have a provision entitling the company to injunctive relief, that the company is now disavowing any right to do so? I would say, yes, for these purposes, I would say the injunctive relief is not the centerpiece of that agreement. The agreement is intended to incentivize a key manager not to compete for a limited period of nine months in exchange for conferring upon that manager substantial financial benefits. And all he has to do is not compete for nine months, and he can keep those benefits. So, yes, for purposes of this argument, I would say LKQ is not seeking to enforce injunctive relief. It didn't seek it in its claims. Well, I guess that was my question. My question was, are you disavowing LKQ's right to seek injunctive relief under the restrictive stock unit agreements? Yes. Mr. Rice, let me ask you a question. I totally understand and do the same thing if I were in your shoes, your reliance upon Kanner Fitzgerald, the recent Delaware Supreme Court decision. The facts here are a little bit different, which I think you'd acknowledge, too. You don't have a partnership context. The way the forfeiture would work is different in the sense that it goes back in time here, whereas if I'm right in Kanner Fitzgerald, it was more forward-looking for a period of years. That's my question. Yes. What principle limits your argument, if any? So forget the fact pattern here for a minute and imagine that John Doe works for ABC Company and has a similar agreement and received and liquidated restricted shares under an agreement that went back for 30 years. He's been working at the company for 30 years. And then in the eighth month after he separated, he engaged in what you would see as a violation of the competition provisions. Is there any limitation at all on how far back you can go, what you can claw back? I mean, what limits this? Your Honor, I think the limits are the limits on whether this satisfies the elements of valid contracts. So you would say in a situation like that that you can claw back perhaps millions of dollars and you can go all the way back to year one and all the way through year 30 cumulatively, there's no limit on that? And you read that in Kanner Fitzgerald? I don't see Kanner Fitzgerald as saying anything different from that. It says that Delaware is a very strong contractarian state. Freedom of contract applies there. It was not limited to the specific facts. The statement in that Supreme Court decision is very broad. Yes, it arose in the partnership context. But remember, Ainslie, the Supreme Court decision, also cited favorably to that whole string of prior Delaware cases, all of which had applied this principle to stock grants or stock options. In doing so, it relied on and cited to deny and haul. Factually, those cases were very different in that they involved high-level employees or sophisticated employees. It does not seem to me, based on the record here, that Mr. Rutledge is similarly situated to those high-level executives. How do you respond to that? Your Honor, I respectfully disagree. He was the plant manager for a Lake City, Florida facility that employed 50 or more employees. He had responsibility for all aspects of that facility. He had access to confidential information on sales, pricing, customers. He ran the roost at that facility. He was one of the key employees that were designated to sign these stock agreements. And that was, in the record, it's not disputed, that's less than 2% of LKQ's workforce were presented with this option. Now, again, let's go back. He did not have to sign these. It was not a condition of employment. He could have not signed it. Is there any indication in the record that prior to signing these documents, he consulted with counsel? I don't know whether he consulted with counsel or not, but remember, Your Honor, he didn't just sign one of these. He signed seven or eight of them in a row. Each year, he signed this agreement. So, there's no indication that his . . . Does it matter legally, in your view, what position . . . To get right at the heart of Judge Sini's hypothetical, does it matter to you what position he held? In other words, you respond factually, but I think embedded in her question is legal. So, suppose, for example, Mr. Rutledge was a tax accountant and he left LKQ and he joined Phoenix to play the role of a tax accountant. Same position? Your Honor, I would say this, that these agreements, these stock grant agreements, are supposed to be provided to employees who are upper-level type managers. Tax accountant very well could be. Well, if a tax accountant is deemed by LKQ to be a key employee and they're less than . . . they're in that group of less than 2% of the employees that receive these agreements, then that's fine. You would say the fact that the tax accountant went to work for Phoenix or anybody else is the end of the matter. It doesn't matter whether the tax accountant . . . The tax accountant would know the business, but in high likelihood, wouldn't know much about customers, pricing lists . . . Your Honor . . . You know, the kind of stuff you're talking about. Your Honor, those are all considerations that you would apply. If this was a straight-up non-compete, then those would be relevant questions to ask. How do you balance the legitimate interest of the employer versus the harm . . . Yeah. The reason we're asking the questions, though, is I get worried about taking Cantor Fitzgerald as without limits unless and until the Delaware Supreme Court says that. And that's why I'm asking you the question. Are there limits, and what are they? I would turn the question on its head, Your Honor. There is no Delaware decision that has indicated that Delaware law would take a restrictive view of these forfeiture for competition provisions. Every court that has looked at this type of provision . . . Pierce, Deny, Hall, Ainslie . . . What about the language in Ainslie that, toward the end, where the court says it's possible that public policy interest or inequitable outcome could, under some circumstances, outweigh the interest in freedom of contract here? I mean, those would be exceptions if it's inequitable or there's some public policy against it. And I think the gist of our questions are going toward inequitable. And, Your Honor, in our view, there is nothing inequitable about these circumstances. He didn't get 30 years' worth of payments. Maybe if you had that example, Judge Scudder, that would be a different case. I know my questions are pushing you a little bit, but when you look at Cantor Fitzgerald . . . And the Delaware Supreme Court has a sterling reputation for precision with corporate law. They say, under the circumstances of this case, comma, et cetera, right up front. And then, when they sum up at the end, it's very hard for me to believe that this is just coincidental or by happenstance or accident or something like that. They say, when sophisticated parties agree in a limited partnership agreement, et cetera. So, at least when they're stating they're holding, they're stating it in a factual context. Again, Your Honor, if Mr. Rutledge was a janitor, if he was a maintenance worker . . . I don't think the janitor example . . . The janitor example, it's got a nice rhetorical flourish. It's totally unhelpful. But he is a sophisticated party, Your Honor. He was a plant manager . . . Was he a plant manager in 2013? What's that? Was he a plant manager in 2013? Yes, Your Honor. It's my understanding he had that same role the whole time he was with LKQ. This is not a guy that was ever occupying a role below the head of that facility. And I think that is a sophisticated party. So, this would not fit within the . . . I guess you could call it the careful hedge that Ainslie announced at the end. You know, it wants to say, look, there could be inequitable circumstances here, but this isn't that a few hundred thousand dollars of stock grants or proceeds that he knew full well he was receiving solely so that he would not compete. And LKQ is entitled to the benefit of that bargain. Do you want to save some rebuttal time? Yeah, I'll save a minute. Can I just say briefly, in the 10 seconds before the minute, we also think that the court got it wrong on is the Illinois Supreme Court's test. That's a balancing test, totality of the circumstances, and Judge Durkin did not properly apply the balancing test. He ignored many factors that favored LKQ. That's all. Okay. Okay. We'll give you that minute. Very well. Ms. Carpenter, good morning. Good morning, and may it please the court. My name is Tiffany Carpenter, and along with my co-counsel, Joseph Barber, it is our honor to appear before you today representing Mr. Robert Rutledge. There are three reasons, at least, that this court should affirm the district court's judgment. The first reason is that the district court correctly determined that the restricted stock unit non-competes and the confidentiality agreement non-competes are unenforceable restraints on trade. Second, the confidentiality non-compete is moved. The damages that were sought as part of the confidentiality non-competes has been disavowed by LKQ and its underlying summary judgment briefs. LKQ said it is not seeking injunctive relief with respect to that correctly dismissed LKQ's unjust enrichment claim because it was not pled in the alternative, and it was pled on a express contract. This court, like all courts, must make a fact-specific determination in every single case that's not unique to this case. There are three important facts that the court should consider when doing so. Ms. Carpenter, if you would address in there, as you know, the Ainslie opinion that the district court relied upon has been reversed by the Delaware Supreme Court, and I know in your 28-J letter you've argued that Ainslie is limited to the limited partnership context. Assume it isn't, which the Third Circuit found very recently it was not. How do you get around that? Your Honor, if I understand your question, it is if Ainslie did not have a limited partnership. If the holding in Ainslie is not limited to the limited partnership context, in other words, if it applies to the RSUAs here, how do you get around Ainslie? Yes, Your Honor. As the district court analyzed the Hall, Pierce, and Dunai cases, those cases specifically have sophisticated, as does Ainslie, a sophisticated employee and sophisticated parties who are contracting subject to, right, in Ainslie it was limited partnership, but that wasn't the case. We're assuming that's not the case there, but these three cases had an administrative committee that was by contract given the role of enforcing the non-compete, and then the courts in those three cases were actually analyzing on abuse of discretion standard whether or not that committee had committed fraud. And what was determined in those cases is that it was fact specific, and in this case the facts are not that Mr. Rutledge is a sophisticated party. He has always been a plant manager. Do we know that? Is that a determination we can make at the Court of Appeals? Absolutely, Your Honors. There are multiple layers of employees above Mr. Rutledge. Do we know that from the record, though? We have to look at what's in the record. Yes, Your Honor. I believe you do. I'm sorry. Go ahead. You can finish. It's in the record, Your Honor. Ms. Carpenter, assume for a moment that we read Cantor Fitzgerald as Judge St. Eve kind of alluded to as applying in those situations where there are sophisticated parties on both sides of the transaction, and here LKQ has alleged that Mr. Rutledge has violated those agreements. In your view, whose burden of proof is at trial, if in this case were to go to trial, to prove that Mr. Rutledge is sophisticated or not sophisticated? Do you think it is LKQ's burden to prove that he's not sophisticated to take advantage of the Ainslie rule, or do you think it is your burden to prove that he is not sophisticated to distinguish Ainslie? Yes, it would be LKQ's burden, Your Honor, because in the specific facts of this case, which must be considered, we have Mr. Rutledge starting in this industry in 2001 for Greenleaf. In 2008, LKQ acquired Greenleaf, and Mr. Rutledge then took that position as a middle manager, a plant manager, and then he continued that what the suggestion was just before I came up here was that because LKQ has decided that Mr. Rutledge is a key employee, he is there for a sophisticated party, but that is not the case. And in the cases that are cited in Delaware, the individuals are vice presidents. They're one of six limited partners in Ainslie. They are third in line to the president of the company. This is not the case here. Is there any evidence as to whether or not Mr. Rutledge consulted with counsel before signing these agreements? Because that's an issue in Delaware law that helps determine if a party is sophisticated. There's no evidence in the record before the court one way or another. So in the two decades that Mr. Rutledge spent as a plant manager, this was the only And the second fact that is important for this court to consider is that the non-competes that LKQ seeks to enforce here is to protect information that Mr. Rutledge had access to and that others who had not executed those non-competes also had access to. The third fact for the court to keep in mind is that LKQ conducted a pre-suit internal investigation before it filed suit against Mr. Rutledge, and that pre-suit internal investigation confirmed that Mr. Rutledge had not contacted customers, employees, solicited any business, or harmed LKQ in any way. The evidence that came out during discovery in this case confirmed that that never was the case. Mr. Rutledge never harmed LKQ with any of the alleged information he had. Yet, LKQ is seeking Mr. Rutledge's, more than five times Mr. Rutledge's current salary as damage. Not because LKQ has been damaged in any way, because it hasn't, but because that's what this agreement, LKQ thinks this agreement allows. Why is there, there seems to be in the briefing a fair bit of dispute. I couldn't figure this out. Dispute about exactly how much money is at stake because both sides seem to agree that he exercised the stock grants, right? He liquidated the stock, and it would seem knowable to Mr. Rutledge what proceeds he realized upon the sale of the stock, right? And so, it just seems to me to be added all up. And they're saying, their position is, and I know you disagree with that, they say, well, we want every last red cent of it back. But why is there so much, there's something in the briefs about, well, we think it's $300,000, they think it's $600,000. That seems mysterious to me. Your Honor, the district court's opinion recognized that there was a variance of how much Mr. Rutledge said that he was, that he had, that potential damages could be, and LKQ disagreed with that. But in this instance, I think LKQ went back to 2011 to seek. Yeah, they want all of it. Right. And in 2013 is when Mr. Rutledge said, well, we think it's $300,000. So, the discrepancy, I think, is because they are asking Mr. Rutledge for not only how much he sold the stock for, but that would include how much he paid taxes on the stock. Notably, Your Honors, that was compensation that was right on his paycheck. There was a line for his salary, for his bonus, and for his RSUs. How much do you think is at stake? Your Honor, I rest on our papers with respect to that specific amount. All right. Ms. Carpenter, the, turning to the restrictive covenant agreements, there's a 75-mile kind of radius, right? And as I understand it, Phoenix does not have a facility within 75 miles of LKQ facility. Is that correct? Your Honor, there is a Phoenix facility within 75 miles, but Mr. Rutledge never worked there. Okay. Okay. And so, it seems like there's some mention in briefing that what brings Mr. Rutledge into, within that radius, is the fact that he worked from home some of the time, and that his house was within 75 miles of a LKQ facility. Is that correct? That is their position, Your Honor. So, when he works from home, and I don't know what this is in the record, but what is he doing at home? So, in other words, does he have any products at the house? Does he have any documents? What is he doing? Yeah, the record states, Your Honor, that Mr. Rutledge, when he first joined Phoenix, was helping a Texas plant with special projects. So, he was communicating on the phone, I'm sure on his computer, but it's not as if he was with anyone within his home to conduct business other than virtually. And remember, this was during the pandemic, right? When we were all subject to our home, unless you were a health care provider or you met a certain definition there. Is he still working at home, though? I got the sense from the record that he still worked at home part of the time. Yes, he does, and he has encompassed that 75-mile radius. So, he lives in or around Lake City and works in his home in or around Lake City? Yes, he still travels for work outside, but he, like many people post-COVID, do work from home from time to time. The RSU non-compete agreement is subject to Delaware law, and the common law, Delaware common law and Delaware General Assembly recognize a strong interest in encouraging competition and ensuring individuals are free to earn a living. There's a three-prong test that must be applied when determining whether or not a non-compete is overly broad and unreasonably restraints trade. We've discussed the first prong, which is the geographic scope. The second, similarly in that same prong, is a temporal duration, and as this applies to the facts, you will recall that the restricted stock unit agreement non-competes do not have any geographic limitation. This means, effectively, that Mr. Rutledge could not work for any company because it's not just a competitor, but a potential prejudicial third party that could harm LKQ in any way if Mr. Rutledge worked there. Any company in any position? In any position. From janitor to CEO? Yes, you said it. Yes, absolutely. And then the temporal duration. The temporal duration, as it applies to the facts in this case, and you did ask me how much do we think is at stake, they are at least seeking hundreds of thousands of dollars. If you don't work in the one industry you've worked in for over two decades and for nine months, or forfeit, give back, over five times your current salary. His salary is about $139,000 now. That is not a reasonable question for a middle manager and employee to be able to make. And Ainslie, the original Ainslie case in 2023, discusses how damages are meant not to be a penalty, but to be a way for someone to be compensated for their loss. And in this case, there simply is no loss that justifies that penalty being applied to Mr. Rutledge. Is there any temporal restriction under the case law with respect to the clawback and how far you can claw back? The cases that have allowed clawbacks have been over a year or two years, not over going back to 2013. That's exactly right. But is there a case law to support that? The case law that's before the court and that we have found simply says that they're going back for a year, or I think it's just a year, but if you've seen something with two years, nothing says these incremental stock proceeds that you received over eight, and I think they even say to 10 years, you need to give that back because that's unreasonable. But is there any case saying you can't do that? That's the flip question. Is there any case saying that temporal restriction applies to the years you're clawing back? I didn't see that. I don't see that specific holding in any of the cases, but the cases that apply and have allowed it are much less egregious to the employee than this one where they're asking for eight to 10 years of compensation that Mr. Rutledge earned. And in fact, in Ainslie, like Judge Scudder mentioned, that dealt with future payments, right, not a callback of prior amounts that were already vested. That's right. And in Ainslie, it did specifically say that it was based on the specific facts of the case, and it did very much highlight that the Ainslie parties were sophisticated parties. They were limited partnership. They were subject to a limited partnership agreement. That agreement was explicitly stating that it was subject to a statute. That statute explicitly says that the contract terms, if you're going to enter into a limited partnership agreement, have to be explicitly followed. None of that exists in this case. Okay, anything, any final word, Ms. Carpenter? Your Honor, thank you for your time. For the reasons articulated here today and also in our brief, we respectfully request that the court affirm the district court's decision below. Thank you. Okay, very well. Thanks to you. Mr. Rice. Yes, a few things that came up in counsel's argument. First of all, the non-compete agreement is not moot at this point because LKQ, if this were remanded for trial on count two, could still seek to prove up damages, even if it can't prove up injunctive relief at this point. So damages are still in play there. The administrative committee argument, we addressed it in our briefs. I'll just say that the Delaware courts or federal courts in Delaware in Hall and Pierce and Dunai, they had to choose a legal path to evaluate these forfeiture agreements, and they chose the path of freedom of contract, not the reasonableness analysis that applies to non-competes. So deference to a factual determination is irrelevant. But the courts in Halpin and Wark went the other way, right? In that they consider provisions like this or clawback provisions to be liquidated damages forfeiture provisions. Well, all I can say, that's not the view of the Delaware Supreme Court that just decided this issue a couple weeks ago. They very emphatically said that the return of supplemental benefits that an employee receives is not tantamount to a penalty. It's not punitive. It doesn't have to be tied to any damage or loss because it's simply restoring the employer to the benefit of its bargain, which under contract law, this court should uphold. Mr. Rutledge should be held to the benefit of his bargain. I'll also say this, and I just want to close, if I may, by just briefly. This is a quote from the Ainslie Supreme Court decision. The distinction between a restrictive non-competition covenant that precludes a former employee from earning a living in his chosen field and an agreement that allows a former partner to compete, but at the cost of relinquishing a observation, significant forfeiture for competition provisions, which unlike restrictive covenants, are not enforceable through injunctive relief, do not prohibit employees from competing and remaining in their chosen profession, and do not deprive the public of the employee's services. That's all. Could I ask one more question, if I might? Mr. Rice, there's some banter in the brief with regard to whether or not customer information, vendor information is protected information under Illinois law for count two. There's some statements in Mr. Rutledge's briefs that there are members of the sales team and other employees who have as much access to that information as Mr. Rutledge did, but are not subject to restrictive covenant agreements. Can you say anything about the accuracy of that statement? It's my understanding that the record does not show that every sales employee signed a non-compete, but the record also does not show that LKQ didn't take other steps to protect its confidential information as to sales employees, such as confidentiality agreements, handbook provisions, steps to keep information password protected. None of that is in the record. None of that is legitimately contested on this record. So yes, they did not provide these agreements to everybody. Thank you. Okay. Mr. Rice, thank you very much. Ms. Carpenter, thanks to you. We'll take the appeal under advisement.